UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DANIEL JONES,

                                        Petitioner,

         v.                                                        9:22-CV-1203
                                                                   (GTS)

MARK MILLER, Superintendent,
Green Haven Correctional Facility[1],

                                        Respondent.

_____

APPEARANCES:                                    OF COUNSEL:

DANIEL JONES
Petitioner, pro se
16-B-3768
Green Haven Correctional Facility
594 Route 216
Stormville, NY, 12582-0010

HON. LETITIA JAMES                              MARGARET A. CIEPRISZ, ESQ.
Attorney for Respondent                         Ass't Attorney General
New York State Attorney General
28 Liberty Street
New York, NY 10005

GLENN T. SUDDABY
United States District Judge

**DECISION and ORDER**

**I.        INTRODUCTION**

_____

[1] According to the Inmate Information Database maintained by the New York State Department of Corrections and Community Supervision ("DOCCS"), plaintiff is currently incarcerated at Green Haven Correctional Facility. *See* https://nysdoccslookup.doccs.ny.gov/ (DIN 16-B-3768) (last visited Apr. 17, 2025).  Therefore, the correct respondent is Mark Miller ("Miller"), the Superintendent of Green Haven Correctional Facility.  The Clerk of the Court is directed to substitute Miller for Michael Capra and revise the caption of this case accordingly.  *See* Fed. R. Civ. P. 25(c).

Pro se petitioner Daniel Jones ("Jones" or "Petitioner") seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254 to vacate his conviction, in the County Court of the State of New York, Onondaga County.  Dkt. No. 1 ("Pet.").  Respondent ("Miller" or "Respondent") was directed to answer the petition.  Dkt. No. 6.  Respondent opposed the petition.  Dkt. No. 16, Memorandum of Law in Opposition ("Resp. Memo."); Answer; Dkt. No. 17 and; Dkt. Nos. 18, 19, 20, State Court Records.  For the reasons that follow, Jones' habeas petition is denied and dismissed.

## II.    RELEVANT BACKGROUND

### A.  Indictment

On June 26, 2015, an Onondaga County grand jury returned an Indictment charging Petitioner with second degree murder and third degree criminal possession of a weapon. Dkt. No. 18-1 at 47-49.[2]  Pursuant to the Indictment, on or about May 14, 2015, Petitioner intentionally caused the death of Gary Paris, Jr. ("Paris") stabbing him multiple times with a knife which resulted in a stab wound to his chest that caused his death.  *Id*.  The incident took place at approximately 9:51 p.m. at the Catholic Charities' Men's Shelter (the "Oxford Inn"), a residential shelter located at 1074 South Clinton Street in Syracuse, New York.  *Id*. at 71; Dkt. No. 19-3 at 83.  On March 29, 2016, Petitioner was arraigned and entered a plea of not guilty. Dkt. No. 19-1 at 1-6.

### B.  Pretrial Proceedings

On October 3, 2016, the parties appeared for a conference before Acting Supreme Court Justice John J. Brunetti.  Dkt. No. 19-1 at 119.  Petitioner's counsel advised the court that he recently received police reports revealing that a third party, named Jose Bussher

---

[2]  Citations to the submissions refer to the pagination generated by CM/ECF, the Court's electronic filing system.

("Bussher"), confessed to "this crime to another homeless person inside the Oxford Inn." *Id.*

at 122.  The court asked, "[s]o you have a police report of Mr. A, and Mr. A told the police that

Mr. A heard X confess to the crime?" *Id.*  Counsel stated, "yes." *Id.*  The court noted:

> So there's been sufficient disclosure to provide you with the
> substance of the alleged exculpatory material to allow your
> investigator to track this person down.  Now, keep in mind that
> there's special hearsay rules on declaration against penal interest,
> but we'll cross that bridge when we come to it.

Dkt. No. 19-1 at 122-123.

On November 10, 2016, during a pretrial conference, the court re-visited the issue.

Dkt. No. 19-2 at 7.  The court noted:

> There is a memorandum that was in the police reports that Mr.
> Sullivan has that talks about a person who appeared at the police
> department and told the police that a person other than Mr. Jones
> had confessed to the killing.  And when Mr. Sullivan asked me
> about pursuing this line or calling a sergeant, and talked about a
> statement against penal interest, I did not react to it because Miss
> McGunnigle states that she is planning to call the human being who
> allegedly confessed.

Dkt. No. 19-2 at 6-7.

The prosecutor advised the court that the People intended to call Bussher to testify at

trial.  Dkt. No. 19-2 at 7.  Addressing Petitioner's counsel, the court noted, "you have a report

of that, and so you will be able to cross-examine that person and you have a good faith basis

to ask him whether he confessed.  We will take it from there." *Id.*  Petitioner's counsel

reserved his right to call Detective Dominguez, the officer who interviewed "this other person"

and discuss with her what follow-up was done. *Id.*  In response, the court stated:

> But listen to me, I am not agreeing with you.  That -- it is easier for
> me to call.  I am going to call -- R is the human being who showed
> up at the police department, and C is the alleged confessor, and
> detective is the detective who spoke to R, okay.  The detective
> would not be permitted to  repeat what R told him as to what C told

R because that's hearsay. Now, R could be called to testify, theoretically, as to what C said, but then the declaration against penal interests components would have to be set forth. And the first is that the declarant must be unavailable, but the declarant is C, and the People are going to call C at the trial, so the declarant is not unavailable. Moreover, there has to be proof that the person actually apprehended [sic], that the statement was being made against his interest, and it was against his interests at the time he made it. And the fact that he makes it to a civilian, although not dispositive, as opposed to a police officer, might reduce that element. But it seems to me we are not going to get that far. But I appreciate you have stated that for the record. You may continue to pursue it, subject to my making rulings. But that's my preliminary ruling.

Dkt. No. 19-2 at 7-8.

### C. Trial

A jury trial was held in Onondaga County Court in November 2016. Dkt. No. 19-2 at 9. The prosecution called several shelter residents to testify. Deon Whitehead ("Whitehead") testified that he arrived at the shelter on May 14, 2015 and saw his friend, a person he called "Mo." Dkt. No. 20-1 at 26. Whitehead identified the Petitioner as "Mo." *Id.* At approximately 9:30 p.m., Whitehead and Petitioner were at "the desk" when a person Whitehead knew as "Shef" began arguing with Petitioner about a female identified as Sonya. *Id.* at 29-31. Whitehead testified that Shef and Petitioner also argued about Sonya the previous night. *Id.* Shef was dating Sonya and told Petitioner to "stop messing with her." Dkt. No. 20-1 at 29-35. Petitioner "shook his head and [ ] walked out and went and smoked a cigarette." *Id.* at 31. Whitehead followed Petitioner out to the yard and saw Shef go to the bathroom. *Id.* at 32-33.

While they were in the yard, Whitehead heard Petitioner tell a "Caucasian dude" to "give [him] a knife." Dkt. No. 20-1 at 33. The individual handed "something" to Petitioner and Petitioner walked into the bathroom. *Id.* at 34. Whitehead followed Petitioner and noticed Shef near the shower. *Id.* at 34-35. Petitioner and Shef began arguing about Sonya and

4

Whitehead attempted to "break it up." *Id.* at 35.  Petitioner left the bathroom and returned with another man, who Whitehead identified as "Sonya's brother or cousin" and described the individual as "Spanish" and "heavy-set."[3]  *Id.* at 36.  Sonya's relative had a conversation with Shef and Petitioner.  Dkt. No. 20-1 at 37.  Whitehead watched a physical altercation between Shef and Petitioner.  *Id.* at 34-35.  During the altercation, Sonya's relative was standing next to Whitehead.  *Id*. at 48.  Shef "swung on [Petitioner] and [Petitioner] hit [the victim] in the chest or stomach area.  *Id*. at 39.  Petitioner "swung at [the victim] . . . like 15 times."  Dkt. No. 20-1 at 39.  Whitehead described the swing as an uppercut.  *Id*. at 40.  As they were fighting, Whitehead heard Shef say, "aw, you stabbed me."  *Id*. at 40.  Whitehead left before the police arrived because he was "not about the stay around a murder."  *Id*. at 42.

On cross examination, Whitehead testified that the police "picked him up" the following day.  Dkt. No. 20-1 at 57.  However, Whitehead admitted that he ran when the police approached him.  *Id*. at 58.  When he was taken into custody, he was wearing the same clothes but the police did not take his clothing, sneakers, or telephone.  *Id*. at 92.

Kevin Santmyer ("Santmyer") testified that he was in the yard at the Oxford Inn on May 14, 2015 and had a conversation with Petitioner.  Dkt. No. 20-2 at 123.  Petitioner asked Santmyer for his knife and Santmyer gave it to him.  *Id*.  Santmyer testified that Petitioner knew Santmyer had a knife because he had asked to use it "before."  *Id*. at 123-124.  Santmyer described the knife as a black switchblade with a straight edge and a green spider web.  *Id*. at 124.  Petitioner took the knife and went inside.  Dkt. No. 20-2 at 125.  Santmyer never saw Petitioner again that evening and did not get his knife back.  *Id*. at 126.  Santmyer

---

[3]  Through subsequent testimony, the jury was told that the individual was Bussher.  Dkt. No. 20-2 at 114.

identified his knife as Exhibits 5, 40, 41, 45, 48[4] and testified that it was the knife he gave Petitioner.  *Id*. at 126-127.

Robert Hilts ("Hilts") testified that he was in the bathroom and saw Petitioner arguing with the victim, who he knew as Paris.  Dkt. No. 20-2 at 3.  Hilts saw Petitioner and Paris engage in a physical altercation.  *Id.* at 4.  Hilts saw Paris swing at Petitioner with a closed fist.  *Id.* at 4.  Hilts then saw Petitioner hit Paris and heard the sound of punches.  *Id.*  Hilts saw Petitioner hit Paris with his right hand through Paris' left side and after a "couple of seconds," Hilts saw "red coming out with what he learned later to be a knife."  Dkt. No. 20-2 at 4.  Hilts described Petitioner's movements and stated, "[o]verhand, the knife in his hand like this.  At first it was like this, underhand to the side and then when [Paris] fell kind of - - I don't know if he switched or it just came down like this, like in the neck or chest area." *Id*. at 5.  Hilts saw Petitioner swing "five to seven times, striking him at least five of those times." *Id.*

Hilts saw Paris fall to the ground and testified that he saw a knife in Petitioner's hand as he "ran by."  Dkt. No. 20-2 at 5-6.  Hilts described the knife as dark in color, black, brown, dark green and six to nine inches long, with a three and half to five-inch blade.  *Id*. at 7.  The knife was "dripping blood."  *Id*. at 8.  Hilts saw Petitioner leave the bathroom and then saw Paris run about 50 to 75 yards and collapse.  *Id*.  The prosecution presented Hilts with People's Exhibit 5, a photograph, and asked if he recognized what was depicted.  Hilts testified that it was a knife that belonged to Kevin Santmyer.  Dkt. No. 20-2 at 15-16.

Will Gary ("Gary") testified that he was in the bathroom of the shelter when he heard an argument.  Dkt. No. 20-2 at 54.  Gary recognized the voices of Petitioner and Paris.  *Id*. Gary left the bathroom and ran to the "ramp."  *Id*. at 57.  While on the ramp, Gary heard Paris

_____

[4]  Exhibit Nos. 5, 40, and 10 are photographs of a knife; and Exhibit 48 is a knife.  Dkt. No. 19-3 at 64-66.

screaming, "he got me." *Id*. at 58.  Paris was "bleeding real [sic] bad."  Dkt. No. 20-2 at 58.

On cross examination, Gary was asked if he knew Bussher and Gary responded, "he sounds

familiar" but denied seeing him in the bathroom. *Id*. at 73-74.

The People called Bussher to testify.  Bussher stated that he was living at the shelter

on South Clinton Street on May 14, 2015.  Dkt. No. 20-1 at 111.  At approximately 10:00

p.m., Bussher was in a bunk when Petitioner woke him up. *Id*. at 114-115.  Bussher could

not remember having any discussion with Petitioner. *Id*.  Bussher got up to go to the

bathroom and saw Petitioner arguing with someone in the shower.  Dkt. No. 20-1 at 118-119.

Bussher heard them arguing about a "girl." *Id*. at 119. Bussher did not see the two men

"fighting" but testified that he saw Petitioner's hands "moving" and "swinging" in the shower."

*Id*. at 120.  Bussher did not see a knife in Petitioner's hands. *Id*.  When Bussher saw the

fight, he did not try to intervene, and left the bathroom.  Dkt. No. 20-1 at 120.  Bussher saw

Petitioner come out of the bathroom and then saw "somebody bleeding." *Id*. at 121.  Bussher

tried to help him but he was running around the shelter. *Id*. at 122.  When the police arrived,

Bussher gave them his name and identification. *Id*. at 123.

On cross-examination, Bussher testified that the police did not ask him any questions

about what happened at the Oxford Inn on May 14th before he left the shelter.  Dkt. No. 20-1

at 147.  Bussher was not interviewed until "last week." *Id*. at 126-128.  From May 14, 2015

until "last week," Bussher had not spoken with anybody from law enforcement. *Id*. at 127.

Petitioner's counsel asked Bussher if he ever told Emilio Velazquez ("Velazquez") that he

stabbed Mr. Paris and Bussher responded, "No." *Id*.  Bussher denied knowing Velazquez.

Dkt. No. 20-1 at 140.

The prosecution called law enforcement officials to testify regarding the police investigation.  Officer Joel Dorchester ("Dorchester") testified that, on May 14, 2015, he was dispatched at 9:43 p.m. to the Oxford Inn.  Dkt. No. 19-3 at 96.  When Dorchester arrived, he observed a light-skinned black male on the floor and noted a "large amount of blood all over the floor."  *Id*. at 97.  The man was naked and had a stab wound to the chest.  *Id*. at 98.  The victim was transported to the hospital and was pronounced dead.  *Id*. at 99-100.

Officer Matthew Freher ("Freher") testified that he reviewed and preserved all video footage from the shelter's video surveillance system.  Dkt. No. 19-3 at 107-108, 114-115. Freher testified that the "actual stabbing" occurred in the bathroom area and thus, was not captured on video.  *Id*. at 115. The video evidence was played for the jury.  *Id*. at 261.  Freher identified "the suspect" entering the shelter.  *Id*. at 132.  The suspect walked to the kitchen ramp area where he spoke with the victim.  Dkt. No. 19-3 at 132.  The suspect and the victim then proceeded to the bunk area.  *Id*. at 133-135.  The victim then moved towards the men's room.  *Id.* at 135.  The suspect then walked towards the bathroom and entered.  *Id*. at 136. After two minutes, the suspect left the men's room and walked to the yard.  Dkt. No. 19-3 at 136-138.  A white male approached the suspect and "reach[es] out and the suspect reaches out toward his hand."  *Id*. at 140.  The suspect returned inside and walked towards the bathroom.  *Id*. at 141.  Freher testified that there was a "commotion" in the bathroom and the suspect exited.  *Id*. at 142.  Later, the victim ran out of the bathroom, staggered and collapsed on the floor.  Dkt. No. 19-3 at 143-144.

Thomas Glauberman ("Glauberman"), a detective in the Crime Scene Unit, testified that he was responsible for processing the scene, collecting evidence, and developing information.  Dkt. No. 20-2 at 82-83, 89.  During an exterior search of the area, Glauberman

recovered a "lock blade knife that was in the open position" inside a sewer grate near a warehouse in front of 1044 South Clinton Street. *Id.* at 89-90. The knife had a 3 ½ inch blade, black handle, and a spider web design on the handle. *Id.* at 90. The knife had red staining. *Id.* at 109. The knife was admitted into evidence and shown to the jury. Dkt. No. 20-2 at 110. The knife was submitted to the Center of Forensic Sciences for examination by the Forensic biology DNA section. *Id.* at 111. The DNA profile developed from the stains matched the DNA profile of Gary Paris. *Id.* at 112.

Dr. Robert Stoppacher ("Dr. Stoppacher") testified that he conducted an autopsy of Gary Paris. Dkt. No. 20-3 at 5. An external examination revealed a stab wound to his chest, his arm, and two stab wounds to his left hip and buttock area. *Id.* Dr. Stoppacher testified that the stab wound to the chest was the "the cause of death of Gary Paris, Jr." as it went "through the skin and through the chest cage or rib cage, and then caused an injury to the heart." *Id.* at 11-13. Photographs of Paris at the hospital and at the time of the autopsy examination were published to the jury. *Id.* at 7-10.

After the prosecution rested, the trial court called Detective Tonya Dominguez ("Dominguez") to the witness stand. Dkt. No. 20-3 at 17. The trial court administered the oath but Dominguez was cautioned that she "may not be answering questions." *Id.* Petitioner's counsel read the portions of a report prepared by Dominguez into the record:

> On Tuesday, May 19th, 2015, I reported to the Criminal Investigation Division on the request of Detective Russin to interview Emilio Velazquez regarding information he obtained regarding the stabbing of Gary Paris, Jr.
>
> Upon arrival, I met with Detective Russin, who led me to the interrogation room where Velazquez was. I then met with Velazquez; and he stated to me he knew the man who stabbed Gary Paris. Velazquez relayed to me it all began with a discussion he overheard in the bathroom at the Oxford Inn. Velazquez stated

while he was in one of the bathroom stalls he heard a tall black man talking to two younger men about money.  He stated the three men were arguing loudly and it sounded like the taller black man wanted money to buy drugs, but the younger men were not giving him any of their money.  The taller black man got angry and started getting physical with the two younger men. At this time, Velazquez then stated that he got out of the bathroom and locked eyes with the taller black man, later identified as Gary Paris, and left the bathroom without saying anything at all to any of the men.

Velazquez then relayed to me that he walked to his room and could still hear the three men arguing.  When Velazquez got to his room, he stated that twenty minutes later, he heard running and screaming in the hallways and got out of bed to see what was going on. Velazquez stated that he saw Paris naked and covered with blood running into every room and acting very distraught. Velazquez stated that he thought Paris was having a panic attack and had harmed himself, but later realized that Paris was asking for help and no one wanted Paris to get their things dirty or messy. Velazquez then stated to me that he left the Oxford Inn and was sitting across the street where he then noticed all the police and ambulance vehicles respond to the scene.

Velazquez stated that he went back to the Oxford Inn around 1600 hours the next day when they reopened the Inn.  Velazquez relayed to me that Jose Bussher approached him and confronted him about some personal issues they had been having.  After all that was resolved, Velazquez stated that Bussher then confided in him and discussed the events that happened the previous night involving the stabbing of Paris.  Velazquez then stated that Bussher confessed to him that he was the person who stabbed and killed Paris at the Oxford Inn after he was awaken from his bed by the two younger men that were in the bathroom with Paris.  Velazquez stated that Bussher punched Paris in the side of the face and Paris hit the wall and fell unconscious.  Velazquez then stated that Bussher stabbed Paris in the chest with the knife and the two younger men came behind Bussher and finished what Bussher had started with Paris.  Velazquez stated that Bussher only stated to him what he did with Paris and nothing else.

While speaking with Velazquez, he provided me with a Facebook picture with the person he identified as Jose Bussher.  Velazquez also viewed a Live Scan photograph of Jose Bussher, DOB /76."

Dkt. No. 20-3 at 18-20.

The people objected to Dominguez testifying before the jury arguing that the testimony was hearsay and that Bussher was not unavailable.  Dkt. No. 20-3 at 20.  The people also argued that Velazquez's statements were unreliable.  *Id.*  The trial court concluded that the proposed testimony was hearsay, for which there was no recognized exception.  *Id*. at 21.  Petitioner's counsel argued that he intended to introduce the document to show that the police had a possible lead four days after the incident, and failed to follow up.  Dkt. No. 20-3 at 22.  The court rejected the argument reasoning

> My response to that is something I often say and some people disagree with. The trial of a criminal action concerns the results of the investigation. The police investigation is not on trial.

Dkt. No. 20-3 at 22.  Petitioner's counsel stated, "Judge, I would note my objection for the record." *Id.*

On November 18, 2016, at the conclusion of the trial, the jury found Petitioner guilty of manslaughter in the first degree and criminal possession of a weapon in the third degree. Dkt. No. 18-4 at 44.

On December 20, 2016, Petitioner was sentenced as a second felony offender to 25 years determinate (plus five years post-release supervision) and 3 ½ to 7 years to run concurrently.  Dkt. No. 18-1 at 45.

**D.  Direct Appeal**

Jones appealed his conviction and, in a counseled brief to the Appellate Division, Fourth Department, asserted that: (1) the trial court improperly precluded Petitioner from offering evidence of third-party culpability violating his right to present a defense and to a fair trial; (2) the verdict was against the weight of the evidence; and (3) the sentence was harsh and excessive.  Dkt. No. 18-1 at 1-29.  The People opposed.  Dkt. No. 18-5 at 8-47.

On March 19, 2021, the Appellate Division rejected Petitioner's argument that the trial court erred in precluding hearsay testimony. *People v. Jones*, 140 N.Y.S.3d 836, 837 (App. Div. 4th Dep't 2021). The court noted that, during an offer of proof, a police officer stated that she was "told by another person that someone else – i.e., a person other than defendant – was responsible for killing the victim." *Id*. The court held that the proposed testimony constituted double hearsay and did not fall within any exceptions to the hearsay rule. *Id*. The court held:

> In light of our conclusion that the officer's proposed testimony was inadmissible hearsay, it is unnecessary for us to consider whether the court properly determined that the initial declarant's purported hearsay admission of culpability did not fall within the declaration against penal interest exception to the hearsay rule. To the extent defendant contends that he was deprived of his constitutional right to present a defense by the court's ruling precluding the proposed testimony, we conclude that his contention is unpreserved.

*Jones,* 140 N.Y.S.3d at 837.

The Appellative Division also found that the verdict was not against the weight of the evidence. *Jones*, 140 N.Y.S.3d at 837. The court noted that "[t]he witness testimony and video footage admitted at trial provided ample evidence from which the jury could conclude that defendant and the victim engaged in an argument and that defendant stabbed the victim while the victim was taking a shower." *Id*. The court also concluded that the jury "was entitled to infer that defendant intended to cause serious physical injury to the victim inasmuch as the evidence established that defendant inflicted a stab wound in the vicinity of the victim's vital organs, which resulted in the victim's death." *Id*. The Appellate Division also found the sentence was not unduly harsh or severe. *Id*. at 838.

Petitioner sought leave to appeal to the New York Court of Appeals, and that application was denied on May 4, 2021. Dkt. No. 18-5 at 65.

### III.    PETITION

Jones contends he is entitled to federal habeas relief for the following reasons: (1) the trial court denied Petitioner his constitutional right to present a defense and to a fair trial by denying his request to introduce evidence regarding the culpability of a third party (Ground 1); (2) the verdict was against the weight of evidence (Ground 2); and (3) his sentence was harsh and excessive (Ground 3).  Pet. at 6-7.

### IV.    LEGAL STANDARDS

#### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §§2254(d)(1), (2); *Cullen v. Pinholster,* 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson*, 569 U.S. 505, 508-509 (2013) (per

13

curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007).

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro,* 550 U.S. at 473-74 (quoting § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.,* 790 F.3d 109, 121 (2d Cir. 2015). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. William*s, 568 U.S. 289, 301 (2013). If there is no adjudication on the merits then the pre-AEDPA de novo standard applies. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

## B.  Exhaustion

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights.  *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (citing 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994).  The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions."  *Daye v. Att'y Gen. of New York,* 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement.").  Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law.  *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)).  "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court."  *Daye*, 696 F.2d at 192.  This exhaustion requirement is satisfied if the federal claim has been " 'fairly present[ed]' " to the state court.  *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court."  *Daye*, 696 F.2d at 191.  A petitioner may fairly present the constitutional nature of his claim in the following manner:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye*, 696 F.2d at 194.

### C.   Procedural Bar

It is "well established that federal courts will not review questions of federal law

presented in a habeas petition when the state court's decision rests upon a state-law ground

that 'is independent of the federal question and adequate to support the judgment.' "   *Walker*

*v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler,* 558 U.S. 53, 55 (2009))

(quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).   Even if the state court proceeds

to consider the merits of an unpreserved claim, its reliance on a procedural ground as one

basis for the denial of the claim precludes habeas review.   *Harris v. Reed*, 489 U.S. 255, 264

n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternate

holding" because "the adequate and independent state ground doctrine requires the federal

court to honor a state holding that is a sufficient basis for the state court's judgment, even

when the state court also relies on federal law.") (emphasis in original).

Procedurally defaulted claims are not subject to habeas review unless a petitioner

shows cause for the default and resulting actual prejudice, or that the denial of habeas relief

would result in a fundamental miscarriage of justice, i.e., that he or she is actually innocent.

*House v. Bell,* 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 327 (1995);

*Jackson v. Conway,* 763 F.3d 115, 133 (2d Cir. 2014).   To establish cause, petitioner must

show that some objective external factor impeded his ability to comply with the relevant

procedural rule.   *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman v. Thompson*, 501

U.S. 722, 753 (1991).   Prejudice requires a petitioner to show "not merely that the errors at ...

trial created a possibility of prejudice, but that they worked to his actual and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions."   *Murray v.*

*Carrier,* 477 U.S. 478, 494 (1986) (quoting U*nited States v. Frady*, 456 U.S. 154, 170 (1982)) (alteration in original).  If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice.  *See id.* at 496 (referring to the cause and prejudice test "in the conjunctive"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Courts have also recognized an equitable exception to the procedural bar in cases where a petitioner can prove actual innocence.  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence–that was not presented at trial." *Schlup,* 513 U.S. at 324; *see also Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir. 2003).  In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327); *see also Doe v. Menafee,* 391 F.3d 147, 160-62 (2d Cir. 2004). The Supreme Court cautioned, however, that "tenable actual innocence gateway claims are rare[.]" *McQuiggan,* 569 U.S. at 386; *see also House*, 547 U.S. at 538 (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case." (quoting *Schlup,* 513 U.S. at 327)) (internal quotation marks omitted).  "The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggan*, 569 U.S. at 401 (internal quotation marks omitted).  "[A]ctual innocence means factual innocence, not mere legal

insufficiency." *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## V.    ANALYSIS

### A. Right to Present a Defense

Petitioner claims that he is entitled to habeas relief because he was denied the right to present a defense and to a fair trial when the trial court refused to allow Petitioner to introduce evidence of third-party culpability.  Pet. at 6.  Respondent argues that this claim is procedurally defaulted and meritless.  Resp. Memo. at 17-34.

#### 1. Procedural Bar

The Appellate Division rejected Petitioner's claim on appeal that the trial court deprived him of his right to present a defense because Petitioner failed to preserve the argument.  *See Jones*, 140 N.Y.S.3d at 837.  The Appellate Division did not explain the basis for the conclusion that this claim was unpreserved.  *See id*.

"Even where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Watson v. Greene*, 640 F.3d 501, 511 (2d Cir. 2011) (internal quotation marks and citation omitted).  Here, there is a "reasonable basis" to infer that the Fourth Department relied on New York's contemporaneous objection rule.  *See id.; Robles v. Lempke*, No. 09-CV-2636, 2011 WL 9381499, at *10 (E.D.N.Y. Sept. 9, 2011) (citations omitted) ("Where the state courts do not make clear their reasons for finding claims unpreserved, federal courts have held that it 'is likely that the Appellate Division relied upon New York's contemporaneous objection rule[]' "), *report and recommendation adopted*, 2012 WL 5507303 (E.D.N.Y. Nov. 14, 2012); *Kelly v. Lee*, No. 11-CV-3903, 2014 WL 4699952, at

*5 (E.D.N.Y. Sept. 22, 2014) ("[a]lthough the Appellate Division did not cite to a statute or case law in finding [the petitioner's] claim unpreserved, the Court assumes this ruling was based on the contemporaneous objection rule").

The contemporaneous objection rule "provides that comments or evidence presented at trial that go unchallenged are not preserved for appellate review." *Holguin v. Lee*, No. 13-CV-1492, 2014 WL 5508331, at *9 (S.D.N.Y. Oct. 31, 2014), *report and recommendation adopted,* 2016 WL 1030129 (S.D.N.Y. Mar. 10, 2016). The rule "requires that an alleged error be 'brought to the attention of the trial court at a time and in a way that [gives it] the opportunity to remedy the problem and thereby avert reversible error.' " *Norcutt v. Miller*, No. 9:15-CV-00221 (JKS), 2016 WL 7429440, at *7 (N.D.N.Y. Dec. 23, 2016) (citing *People v. Luperon*, 647 N.E.2d 1243, 1246-47 (N.Y. 1995)). "New York courts routinely apply the contemporaneous objection rule in denying review [of constitutional claims] where a specific objection based on constitutional grounds was not interposed at trial to preserve the claim." *Severino v. Phillips*, No. 05 CIV. 475, 2008 WL 4067421, at *7 (S.D.N.Y. Aug. 25, 2008) (citations omitted); *see also Wright v. Duncan*, 500 Fed. App'x 36, 38 (2d Cir. 2012) (finding that defense counsel's objection that the evidentiary ruling was "unfair" was not an explicit due process objection and rejecting the argument that the trial court should have understood that he was raising a constitutional objection from). "[A]ny constitutional objection to a trial court ruling must be identified as such in order to avoid 'preclud[ing] the trial court and prosecution from considering and, thus, avoiding any constitutional error which . . . differs from the trial evidence error which was preserved." *Person v. Ercole*, No. 08 CIV. 7532, 2015 WL 4393070, at *3 (S.D.N.Y. July 16, 2015) (citations omitted). In this Circuit, the contemporaneous objection rule has regularly been recognized as an independent and

adequate state law ground sufficient to preclude habeas review.  *See, e.g., Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011); *Whitley v. Ercole,* 642 F.3d 278, 292 (2d Cir. 2011).

Here, Petitioner's counsel responded to the trial court's decision to exclude Dominguez's testimony stating, "I would note my objection for the record."  Dkt. No. 20-3 at 22.  Counsel did not raise the issue of Petitioner's constitutional right to present a defense or to a fair trial.  *See id*.  Thus, he did not "substantially comply" with the contemporaneous objection rule.  Counsel's "general objection" was "insufficient to preserve his constitutional claims under New York law." *Liggan v. Senkowski,* 652 Fed. App'x 41, 43 (2d Cir. 2016) (citations omitted); *see Person*, 2015 WL 4393070 (finding that the defense counsel's objection did not comply with the contemporaneous objection rule because it focused on "state evidentiary rules concerning hearsay" without "emphasizing the defendant's constitutional right to confront witnesses or present a defense"); *see also Matos v. Ercole*, No. 08 CIV. 8814, 2010 WL 2720001, at *6 (S.D.N.Y. June 28, 2010) (holding that the defense counsel objection "to certain elements of the relevant testimonies" was not specifically based on constitutional grounds and thus, did not "substantially comply with the state rule because it does not place the specific issue into dispute before the trial court").

Because Petitioner never raised a constitutional objection in trial court, the Fourth Department held the issue unpreserved.  This finding represents an independent and adequate state ground.  *See Downs*, 657 F.3d at 104 ("we have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule . . . [and] constitutes an independent and adequate state law ground . . ."); *Kimbrough v. Bradt,* 949 F.Supp.2d 341, 361 (2d Cir. 2013) ("It is well established that this preservation rule is a firmly established and regularly followed state practice that bars

subsequent habeas review.").  Therefore, this Court may not consider Petitioner's claim, unless Petitioner can show either cause for the procedural default and actual prejudice or actual innocence.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) ("The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds."); *Norcutt*, 2016 WL 7429440, *7.  Because cause has not been established, no discussion of prejudice is necessary.  Thus, there is nothing that can save Petitioner's procedurally defaulted claim: habeas relief is precluded.  Even if this claim was not procedurally defaulted, no habeas relief would issue.

### 2.  Merits

"The right to present a defense is one of the 'minimum essentials of a fair trial.' " *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) (citing *Chambers v. Mississippi,* 410 U.S. 284 (1973)).  "It is well established under the Fifth and Fourteenth Amendments that a defendant has a constitutional right to present witnesses in his own defense and challenge the state's allegations through the proper introduction of exculpatory evidence." *Wright v. Duncan*, 31 F.Supp.3d 378, 396 (N.D.N.Y. 2011) (citing *Chambers*, 410 U.S. at 294).  The right to call witnesses, however, is not unlimited.  A criminal defendant must comply with established rules of procedure, and may not offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.  *See Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1987)).

"[S]tate evidentiary rulings are generally a matter of state law and not subject to habeas review." *Daniel v. Conway*, 498 F.Supp.2d 673, 682 (S.D.N.Y. 2007) (citing *Estelle v.*

*McGuire*, 502 U.S. 62, 72 (1991)); *see also Crane v. Kentucky,* 476 U.S. 683, 689 (1986)

("We acknowledge . . . our traditional reluctance to impose constitutional constraints on

ordinary evidentiary rulings by state trial courts" because "the Constitution [provides] . . .

judges who must make [dozens, sometimes hundreds, of decisions concerning the

admissibility of evidence] wide latitude[.]").  "[F]or a habeas petitioner to establish that a state

court's evidentiary ruling violated his constitutional due process rights, he must show that the

ruling 'deprived him of a fundamentally fair trial.' "  *Davidson v. Capra*, No. 15 CV 9840, 2018

WL 1637967, at *12 (S.D.N.Y. Apr. 4, 2018), *report and recommendation adopted*, 2019 WL

2342980 (S.D.N.Y. May 31, 2019).  "Where evidence is erroneously excluded the test for

determining whether the ruling denied the defendant a fair trial is whether the excluded

evidence would have created a reasonable doubt that did not otherwise exist."  *Soto v.

Lefevre,* 651 F.Supp. 588, 594 (S.D.N.Y. 1986).

> In determining whether a state court's alleged evidentiary error
> deprived a petitioner of a fair trial, federal habeas courts engage in
> a two-part analysis, examining (1) whether the trial court's
> evidentiary ruling was erroneous under state law, and (2) whether
> the error amounted to the denial of the constitutional right to a
> fundamentally fair trial.

*Taylor v. Connelly*, 18 F.Supp.3d 242, 257 (E.D.N.Y. 2014) (citing *inter alia Wade v. Mantello*,

333 F.3d 51, 59-60 & n.7 (2d Cir. 2003)).

### a.  Exclusion Under Hearsay

With respect to Dominguez's proposed testimony; i.e., that she was told by Velazquez

that Bussher was responsible for the murder, the Appellate Division concluded that "[t]he

officer's proposed testimony about another person's statements concerning the statements of

yet another person constituted double hearsay."  *Jones*, 140 N.Y.S.3d at 837.  The Appellate

Division further noted, "the court properly determined that the officer's proposed testimony

was in inadmissible inasamuch as the statement made to her relaying the purported third-party admission constituted hearsay and did not fall within any of the exceptions to the hearsay rule." *Id*.

Trial courts may not "mechanically" apply the hearsay rule in a manner that prohibits a defendant from presenting evidence of third-party confessions. *Wade*, 333 F.3d 51, 57-58 (2d Cir. 2003). In *Chambers*, the Supreme Court held that the proposed hearsay statements were "reliable" because the statements were made spontaneously, shortly after a shooting, and each statement was corroborated by other evidence, including eyewitness testimony. *See Hansen v. Smith*, No. 9:04-CV-574 (GLS), 2008 WL 3925637, at *12 (N.D.N.Y. Aug. 20, 2008) (citing *Chambers*, 410 U.S. at 298, 300). Following *Chambers,* the Second Circuit has permitted the admission of hearsay evidence if it has a "sufficient indicia of reliability" and if "its exclusion deprived the defendant of a fair trial." *Soto,* 651 F.Supp. at 597 (finding that *Chambers* did not support admission of evidence that lacked any corroboration as the evidence did not "bear the persuasive assurances of trustworthiness[.]") (citations and internal quotation marks omitted), *aff'd*, 812 F.2d 713 (2d Cir. 1987).

The Court has reviewed Velazquez's statement and the trial court's rulings and finds that the decision to exclude the evidence, on the basis of hearsay, did not violate Petitioner's constitutional rights. Initially, it must be noted that the statement was made one time, during one interview with Dominguez, eighteen months before trial. Dkt. No. 18-4 at 43. Velazquez was not a witness to the altercation and was not in the bathroom at the time of the incident. Moreover, Velazquez admitted that he and Bussher had "personal issues" supporting the inference that Velazquez had reason to fabricate his statement. Second, Petitioner's counsel was unable to locate Velazquez and thus, he was not available to testify at trial. Third, the

issue of Dominguez's proposed testimony was discussed during two pretrial conferences and an offer of proof was made during trial. At no time during those conferences did Petitioner present any evidence corroborating Velazquez's statement. In fact, the evidence presented at trial contradicted Velazquez's account. To wit, Hilts and Whitehead testified that Petitioner and Paris argued over "a girl," not over money. Hilts also testified that he did not see Bussher in the bathroom. While Whitehead claimed he saw Bussher was in the bathroom, Whitehead testified that Bussher stood next to Whitehead during the physical altercation and was not involved in the incident. Velazquez's statement is also directly belied by Santmyer who testified that he gave Petitioner his knife; the same knife that was recovered near the scene and tested positive for Paris' DNA. The jury was not presented with any evidence suggesting that Santmyer gave his knife to Bussher. Finally, Bussher was specifically asked about Velazquez's statement and testified that he did not tell anyone that he stabbed Paris and, in fact, he denied knowing Velazquez. Dkt. No. 20-1 at 140.

Based upon the aforementioned, this Court cannot conclude that Velazquez's statement included the "sufficient indicia of reliability" to have permitted its admission as substantive evidence. *See Hansen*, 2008 WL 3925637, at *12; *see also Molina v. Graham*, No. 12-CV-00333, 2014 WL 287608, at *9 (W.D.N.Y. Jan. 24, 2014) (finding that the trial court properly excluded third-party statements as inadmissible hearsay noting that there was no evidence corroborating the statements and the declarant was unavailable); *Norcutt*, 2016 WL 7429440, at *7 (reasoning that trial court's evidentiary ruling did not deprive the defendant of a fair trial because there was "no evidence of third-party guilt beyond rank speculation"); *Wright*, 31 F.Supp.3d at 401 (holding that while the petitioner had a constitutional due process right to challenge the State's allegations through the proper introduction of

exculpatory evidence, he failed to establish the proposed witness was unavailable and thus, "failed to comply with New York's unquestioned power to exclude exculpatory evidence through a rule designed to serve the interests of fairness and reliability—hearsay"). Accordingly, the trial court's decision to exclude the proposed evidence cannot be deemed erroneous.

Alternatively, even if the decision was erroneous, Petitioner was not denied a fair trial because the court permitted Petitioner's counsel to discuss Bussher's alleged involvement during cross examinations and closing arguments.   As noted *supra,* Petitioner's counsel was provided with ample opportunity to cross examine Bussher about his alleged statement to Velazquez.  Bussher testified that he did not make the statement and he did not know Velazquez.  Petitioner's counsel also asked the other shelter residents if they recalled seeing Bussher in the vicinity of the incident and discussed Bussher's alleged involvement in the altercation during summation.  *See* Dkt. No. 20-3 at 59.

Upon review, the Court finds that Petitioner was not deprived of the opportunity to present Bussher's alleged involvement to the jury.  *See United States v. Rivera*, 791 Fed. App'x 200, 208 (2d Cir. 2019) (noting that the court "did not entirely preclude[ ] [the defendant] from fleshing out his main defense theory.  Instead, its evidentiary ruling narrowly precluded [the defendant] from eliciting a single hearsay statement. The Court still permitted defense counsel to cross-examine [the witness]").  Upon review of the record, this Court finds that the trial court's decision to exclude the evidence "did not run afoul of *Chambers*" and did not deprive Petitioner of a fundamentally fair trial.  *See Davidson*,  2018 WL 1637967, at *13 (citation omitted) (noting that, in *Chambers*, "the excluded evidence was the only means by which the defendant could have put before the jury the particular defense theory that was

derailed by the trial court's evidentiary rulings"); *Norcutt,* 2016 WL 7429440, at *7 (reasoning

that trial court's evidentiary ruling did not deprive the defendant of a fair trial because he was

able to argue the existence of an alternative suspect).

Furthermore, given the strength of the evidence against Jones, the exclusion of the

evidence was not a violation of Petitioner's constitutional rights.  The jury was presented with

several recordings of video surveillance depicting Petitioner.  In addition, the jury heard

testimony from the officers regarding evidence recovered from the area, including the knife

related to the murder.  The jury also heard testimony from eyewitnesses who identified

Petitioner as the assailant.  Accordingly, habeas relief on this issue is not warranted.  *See*

*Thompson v. Artus*, No. 10-CV-1443, 2013 WL 6408354, at *11 (E.D.N.Y. Dec. 6, 2013)

(reasoning that the trial court appropriately excluded the alleged third-party culpability

evidence noting it contained "multiple layers of conflicting hearsay" coupled with "the strength

of the evidence inculpating" the petitioner); *Molina,* 2014 WL 287608, at *9 (finding that,

based upon the strength of the evidence inculpating the petitioner, the trial court properly

excluded third-party statements as inadmissible hearsay).

### b. **Exclusion Under Alternate Theory**

To the extent that Petitioner claims that the trial court improperly excluded the

evidence on the alternative theory; the thoroughness of the police investigation, that claim

lacks merit.  "[W]ell-established rules of evidence permit trial judges to exclude evidence if its

probative value is outweighed by certain other factors such as unfair prejudice, confusion of

the issues, or potential to mislead the jury."  *Holmes v. South Carolina*, 126 S.Ct. 1727, 1732

(2006).  "Under New York law, 'admissibility of third-party culpability evidence is [governed

by] the general balancing test' of all evidence, meaning the judge must 'weigh the

countervailing risks of delay, prejudice and confusion . . . against the probative value of [the] evidence.' " *Saunders v. LaManna*, No. 18 CIV. 12406, 2024 WL 2188866, at *12 (S.D.N.Y. Feb. 8, 2024) (citations omitted), *report and recommendation adopted,* 2024 WL 1657419 (S.D.N.Y. Apr. 17, 2024).  Courts must exclude evidence "if its probative value is outweighed by a risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* (internal quotation marks omitted) (citing Fed. R. Evid. 403).

In *Watson v. Greene*, the petitioner sought habeas relief arguing that the trial court deprived him of his Sixth Amendment right to cross-examination a detective regarding a note of a telephone report ("the Note").  *Watson*, 640 F.3d at 503.  The Note memorialized a telephone call that the detective received from an individual who reported a conversation she overheard implicating a third party in a murder.  *Id.*  The district court granted habeas relief, and the Second Circuit reversed.  *Id.*  The Circuit found that while cross-examination on the Note may have had probative value, that value was "significantly diluted" because the information in the Note was "derived from multiple hearsay and the jury reasonably could have determined that the detective's decision not to follow up on unreliable information that [a third party] was the shooter – particularly in light of the strength of the remaining evidence – did not reflect a serious lack of thoroughness in the police investigation." *Id*. at 511.  As such, the trial judge was reasonably "concerned with the possibility that the jury would be misled or distracted by the suggestion that the Note was substantive evidence" that a third party was the shooter.  *Id.*   "*Watson* held that the trial court's exclusion was not an 'unreasonable' application of Sixth Amendment law for these reasons: (a) the likelihood that the note would cause confusion; (b) the police department's inability to determine the note's author; (c) the

strength of the evidence the police already possessed may have indicated to the jury that a disregard of the note 'did not reflect a serious lack of thoroughness in the police investigation'; and (d) the fact that the defendant had available to him, and indeed had introduced, ample alternative evidence to discredit the police investigation." *Alvarez v. Ercole*, 763 F.3d 223, 232 (2d Cir. 2014) (citing *Watson,* 640 F.3d at 511-512). The Circuit also noted that the trial court's decision to exclude the Note did not amount to a violation of the petitioner's constitutional rights and was not a "blanket prohibition" on the petitioner's ability to inquire into the thoroughness of the police investigation. *Watson*, 640 F.3d at 511-512. Indeed, the trial court allowed the petitioner's counsel to inquire into this topic on cross-examination and summation. *Id.*

In *Alvarez*, a subsequent case that presented a similar legal issue, the Second Circuit found in favor of the petitioner, noting the substantial difference in the factual scenario in comparison to *Watson*. In *Alvarez*, the petitioner sought to introduce a report implicating a third party in a shooting that "contained multiple levels of hearsay," not to show that there was an alternate perpetrator, but to demonstrate that the police had failed to investigate leads. *Id.* at 226, 230-231. The Second Circuit found that the trial court's "total exclusion" of an inquiry into this theory, was "an unreasonable application" of Sixth Amendment law. *Id.* at 232. Acknowledging *Watson*, the Circuit noted that the case was "quite different" because the trial court left Alvarez "without any support for his theory of the case." *Id.* The Circuit also noted that, "given the relative weakness of the case against Alvarez," Alvarez "should not have been precluded from contradicting the portrayal of the NYDPC investigation as "thorough and reliable." *Alvarez*, 763 F.3d at 232.

Applying the reasoning in *Watson* and *Alvarez* to the facts at hand, this Court concludes that trial court's decision to exclude Velazquez's statement did not amount to a violation of Petitioner's constitutional rights.  Upon review of the trial testimony and evidence, it is clear that the probative value of Velazquez's statement was outweighed by the possibility that the jury could have considered the statement for the truth of the matter asserted; that Bussher was the stabber.  *See Rivera*, 791 Fed. App'x at 208.  Moreover, Petitioner was not entirely precluded from discussing the thoroughness of the police investigation.  The trial court permitted Petitioner's counsel to question the thoroughness of the police investigation in opening statements, through cross examinations, and closing arguments.  In his opening statement, Petitioner's counsel told the jury to "watch the police work that went on with [the witnesses.]"  Dkt. No. 19-3 at 89.  Petitioner's counsel explained that Bussher was on video surveillance and present at the shelter during the incident however, the police did not speak with Bussher "about what he saw" until "sometime last week, a year and a half after the crime."  *Id.*  Counsel also stated, "[w]ithin several hours of this crime, the police had already made up their mind that Daniel Jones did this."  *Id*. at 91.  Counsel also told the jury that other residents were never questioned by the police, despite the fact that they were present at the time of the incident and seen on video surveillance.  Dkt. No. 19-3 at 93, 94.  Counsel concluded his opening stating:

> Ask yourself why [residents] were not interviewed until a week ago, within the last few weeks? What did the police do for seventeen months? They didn't do anything because, in less than two hours, they blame this incident, this murder, on Daniel Jones. I would submit to you that they did not do a thorough investigation.

Dkt. No. 19-3 at 94.

On cross examination of Whitehead and Bussher, Jones' counsel elicited testimony suggesting that the police failed to collect forensic evidence or conduct timely interviews. During summation, Petitioner's counsel argued that the investigation was not thorough and the crime was not a "high priority" for the police.  Dkt. No. 20-3 at 59.  Counsel pointed out that "the first cops on the scene," did not obtain any "suspect information" and "failed to keep the shelter residents their until further police arrived."  *Id*. at 61.  Counsel argued that Whitehead was "I.D'ed as a witness by [ ] detectives" and "should have been identified as a suspect" because he was in the bathroom "the whole time."  *Id*. at 61-64.  Counsel also questioned the decision not to interview Bussher, who was depicted clearly in the video surveillance.  *Id.* at 64.  Counsel opined that the police were "rushed through this entire case" and treated the crime as a "misdemeanor."  *Id*. at 63.

Jones' counsel told the jury:

> Jose Bussher, the guy who said he was asleep to the police, follows him in.  He was in the bathroom, and the police caught up with him eight days ago, before this trial.  What did they do for 500 days?  Was this a high-priority crime for them to solve? At a homeless shelter? If it happened out in Manlius, you bet your bottom dollar you would have gotten better police work. Well, because this happened down at a homeless shelter doesn't shift that burden and make it any lower.

Dkt. No. 20-3 at 59.

Accordingly, the trial court did not entirely prohibit inquiry into the thoroughness of the investigation.  *See Watson*, 640 F.3d at 511 (noting that the petitioner's counsel argued on summation that the police "had jumped too quickly to the conclusion that [the petitioner] was the killer, and had passed up the opportunity" and failed to "test that theory by pressing [. . ] (the only other candidate for the role of shooter) as vigorously as they had interrogated [the petitioner].").  Jones has not demonstrated how the inclusion of this evidence would have

changed the outcome of the trial, "particularly given the minimal probative value of the evidence and the overall strength of the prosecution's case." *Davidson,* 2018 WL 1637967, at *13.

For the aforementioned reasons, Ground 1 is denied and dismissed.

**B.  Weight of Evidence/Legal Sufficiency (Ground 2)**

Petitioner claims that the verdict was against the weight of the evidence because trial witness testimony was inconsistent and, "no DNA or fingerprints" were found on the weapon. Pet. at 7.  Respondent answers that a claim that a verdict was against the weight of the evidence is not cognizable on habeas review.  Resp. Memo. at 35.  Respondent further argues, even assuming the petition raised a legal sufficiency claim, that claim is unexhausted, procedurally defaulted, barred from habeas review on an adequate and independent state law ground, and without merit.  *Id.* at 35-42.

A "weight-of-the-evidence" claim and a "legal sufficiency" claim are related, but have different standards.  *See Romero v. Miller*, No. 9:18-CV-381 (GLS/ATB), 2019 WL 5743500, at *5 (N.D.N.Y. Apr. 18, 2019), *report and recommendation adopted*, 2019 WL 5703612 (N.D.N.Y. Nov. 5, 2019).  "It is well-settled that claims attacking a verdict as against the weight of the evidence are not cognizable in a federal habeas proceeding."  *Kimbrough v. Bradt,* 949 F.Supp.2d 341, 360 (N.D.N.Y. 2013); *see also McKinnon v. Superintendent, Great Meadow Corr. Facility,* 422 Fed. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that the verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus.") (citing cases).

In light of Petitioner's pro se status and the arguments in Respondent's brief, the Court will construe the petition as asserting a legal sufficiency claim.

### 1.  Exhaustion

Petitioner appealed his conviction arguing the verdict was against the weight of the

evidence.  Dkt. No. 18-1 at 23.  In support of this claim on appeal, Petitioner specifically

argued that his actions were not "of a purposeful mind" but were "more demonstrative of

recklessness than of an intent to cause serious physical injury" to support his insufficiency

claim.  *Id.* at 23-25.  On appeal, Petitioner did not argue, as he does now in his federal

habeas petition, that trial testimony was inconsistent or that the forensic evidence presented

at trial was insufficient to support the convictions.  *See* Pet. at 7.

The Appellate Division concluded, "the verdict is not against the weight of the

evidence.  Even assuming, arguendo, that a different verdict would have been unreasonable,

we cannot conclude that the jury failed to give evidence the weight it should be accorded."

*Jones*, 140 N.Y.S.3d 837 (citations omitted).

"In order to have fairly presented his federal claim to the state courts the petitioner

must have informed the state court of both the factual and legal premises of the claim he

asserts in federal court."  *Daye*, 696 F.3d at 191 (emphasis added).  Here, the Appellate

Division rejected petitioner's weight of the evidence claim, "without any mention of the

standards governing the sufficiency of the evidence."  *See Pham v. Kirkpatrick*, 209

F.Supp.3d 497, 513 (N.D.N.Y. 2016), *aff'd,* 711 F. App'x 67 (2d Cir. 2018).  Because

Petitioner did not support his sufficiency claim in state court by challenging the consistency of

testimony or lack of forensic evidence, the state court cannot be said to have had a full

opportunity to address and decide the issue.  It is clear that Petitioner's argument was

directed to his weight-of-the evidence, and not the sufficiency-of-the-evidence, claim.

Accordingly, Petitioner did not "fairly present a legal sufficiency claim in state court[.]" *Daye*, 696 F.3d at 191. (quotation marks omitted).

Petitioner's sufficiency claim is unexhausted.

### 2.  Procedural Bar

Petitioner's claim is also procedurally defaulted.  Petitioner cannot now return to state court to present his sufficiency-of-the-evidence claim because he has already taken his one appeal and applied for leave to appeal to the New York State Court of Appeals.  *See Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991) (explaining that, where "the one request for leave to appeal" was taken and additional collateral review would be barred because the issues could have been raised on direct appeal, "petitioner no longer has 'remedies available' in the . . . state courts").

As discussed *supra*, once a claim has been deemed procedurally defaulted, it is subject to dismissal unless the petitioner can demonstrate "cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)."  *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).

Petitioner has not made the required showing of cause and prejudice or actual innocence to overcome the procedural bar to having his defaulted claim addressed by this Court.  *See Kimbrough*, 949 F.Supp.2d at 361 ("Petitioner has not attempted to establish either cause for his procedural default or that he would be prejudiced should his claim not be reviewed. . . . Further, . . . petitioner has made no showing that he is actually innocent of the underlying criminal charges at issue in this case.").

### 3.  Merits

Petitioner's claim is also subject to denial because it is meritless. The constitutional standard for challenges to the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) ("A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."). In making this determination, "pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Brown*, 776 F.2d 397, 403 (2d Cir. 1985) (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028 (1970)).

Additionally, "the reviewing court must draw all reasonable inferences and resolve all issues of credibility in favor of the verdict." *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989) (citation omitted); *see also Cavazos*, 565 U.S. at 2 ("[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial."). Therefore, "we must credit every inference that could have been drawn in the government's favor[.]" *United States v. Villegas*, 899 F.2d 1324, 1339 (2d Cir. 1990) (citation omitted); *see also Lane v. Graham,* No. 9:14-CV-01261 (JKS), 2016 WL 154111, at *8 (N.D.N.Y. Jan. 12, 2016) ("Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.") (citing *Schlup v. Delo*, 513 U.S. 298, 330 (1995)).

In sum, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that [state court appellate] judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless

uphold." *Cavazos*, 565 U.S. at 2.  Furthermore, given that a federal habeas claim receives a second level of deference, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court . . . instead . . . the state court decision [must be] 'objectively unreasonable.' " *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

While "federal courts must look to state law for the substantive elements of the criminal offense . . . the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655 (citations omitted). Juries are given "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." *Id*. (internal quotation marks and citations omitted).

Here, Petitioner argues that the witness testimony was inconsistent and relies upon the lack of forensic evidence "found on the weapon that they said was used in the crime." Pet. at 7.  These argument go to the weight of the evidence, not a legal sufficiency claim. *See Page v. Conway*, No. 10 CIV. 5264, 2013 WL 2896798, at *12 (S.D.N.Y. May 3, 2013) (reasoning that the petitioner's arguments related to the lack of "blood evidence" go to the weight of the evidence), *report and recommendation adopted,* 2014 WL 1877677 (S.D.N.Y. May 8, 2014).  In the petition, Jones failed to address or discuss the elements of the crimes he was charged with and does not argue that the prosecution failed to prove the elements beyond a reasonable doubt.

Even if this Court entertains Petitioner's argument, presented in his appellate brief, that the evidence did not support a finding that Petitioner intended to cause serious physical injury, *see* Dkt. No. 18-1 at 23, the argument lacks merit.  The Appellate Division held, "[t]he

witness testimony and video footage admitted at trial provided ample evidence from which the jury could conclude that defendant and the victim engaged in an argument and the defendant stabbed the victim while the victim was taking a shower." *Jones*, 140 N.Y.S.3d at 837.  The Appellate Division concluded, "the jury was entitled to infer that defendant intended to cause serious physical injury to the victim inasmuch as the evidence established that defendant inflicted a stab wound in the vicinity of the victim's vital organs, which resulted in the victim's death." *Id.*

Although its conclusion is brief, the Appellate Division's analysis comports with *Jackson v. Virginia*.  Having reviewed the court's decision and the trial transcript, and applying the "doubly deferential" standard of review, the Court cannot find that the state court's decision was "objectively unreasonable."  *Kimbrough*, 949 F.Supp.2d at 362; *see also Hirsh v. McArdle*, 74 F.Supp.3d 525, 536 (N.D.N.Y. 2015) (stating that a rational trier of fact, viewing the evidence presented at trial in the light most favorable to the prosecution, "could have found 'the essential elements of the crime[s] beyond a reasonable doubt.' " (quoting *Jackson*, 443 U.S. at 319)) (alteration in original).

As relevant here, the elements of first degree manslaughter are that "[w]ith intent to cause serious physical injury to another person," one "causes the death of such person or of a third person." *Silvestre v. Capra*, No. 15 CIV 9425, 2018 WL 3611988, at *18 (S.D.N.Y. July 27, 2018) (citing N.Y. Penal Law § 125.20(1)).  As discussed *supra*, the evidence before the jury included eyewitness testimony.  Specifically, the jury heard from Santmyer, who stated that Petitioner asked him for his knife.  Through the testimony of Whitehead and Hilts, the jury heard that Petitioner "swung" at Paris five to fifteen times, striking him in the chest area.  Crediting this testimony, the jury could have found the requisite elements of intent and

causation beyond a reasonable doubt. *See id*. at *18–19. Furthermore, the circumstantial evidence supports the verdict. Specifically, Whitehead testified that Jones and Paris argued before the stabbing, there was video surveillance depicting Petitioner throughout the shelter, and according to Dr. Stoppacher, Paris' death was caused by a stab wound to his chest. The jury also heard from the police investigator that a knife was recovered near the scene and Paris' DNA was found on the knife. Santmyer identified the knife as the one he gave to Jones.

Based upon the aforementioned, the Court finds that a rational finder of fact viewing the evidence presented at trial in the light most favorable to the prosecution, could have found beyond a reasonable doubt that Petitioner had the requisite mens rea to cause serious physical injury to the victim. *See Silvestri; see also Colbert v. Scheiderman*, No. 15-CV-5961, 2016 WL 4440690, at *2 (S.D.N.Y. Aug. 23, 2016) (denying habeas relief where the evidence established that the petitioner repeatedly punched and pushed the victim and that the petitioner blocked the victim from escaping the beating and thus, a reasonable factfinder could have found the petitioner guilty of first-degree manslaughter). Thus, the Appellate Division's decision was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[.]" 28 U.S.C. § 2254(d)(1). Nor was the court's decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d)(2).

Accordingly, Ground 2 is denied and dismissed.

**C. Sentence**

Petitioner claims that the trial court's-imposed sentence was harsh and excessive. Pet. at 7. Respondent avers that Petitioner's excessive sentence claim is not cognizable on federal habeas review. Resp. Mem. at 42.

It is well-settled that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); *see also Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); *Grimes v. Lempke*, No. 9:10-CV-0068 (GLS/RFT), 2014 WL 1028863, at *3 (N.D.N.Y. Mar. 14, 2014) ("It is well settled that the issue of whether a sentence was overly harsh or excessive is not a proper issue for review in the habeas context unless the sentence was outside of the permissible range provided for by state law.") (citing *White*, 969 F.2d at 1383).

Here, Petitioner was found guilty of first-degree manslaughter, a Class B felony, and third-degree criminal possession of a weapon. *See* N.Y. Penal Law §§ 125.20(1), 125.20(4), and 265.02(a). Further, Petitioner stipulated that he was a second felony offender. Dkt. No. 20-4 at 26. "A defendant convicted of a class B felony under New York law must be sentenced to at least five years and no more than twenty-five years." *Myers v. Royce*, No. 20-CV-2679, 2023 WL 9057354, at *8 (E.D.N.Y. Dec. 29, 2023) (citing N.Y. Penal Law § 70.02(3)(a). For a defendant who is a second felony offender, the sentence must be at least nine years and must not exceed twenty-five years. *Id*. (citing N.Y. Penal Law § 70.06(3)(b)). Criminal possession of a weapon in the third degree is a class D felony. *Williams v. Lee*, No. 14-CV-597, 2019 WL 935958, at *8 (S.D.N.Y. Feb. 26, 2019) (N.Y. Penal Law §§ 125.20 &

265.02).  A sentence for a class D felony must be at least two years and cannot exceed

seven.  N.Y. Penal Law § 70.02(3)(a),(c).  *Id*.

      Here, on the conviction of manslaughter, the court sentenced Petitioner to a

determinate 25-year period of incarceration with five years of post-release supervision and,

as to the criminal possession conviction, the court sentenced Petitioner to 3 ½ to 7 years, to

run concurrently.  Dkt. No. 20-4 at 37.  Because the imposed sentences fall within the range

proscribed by state law, Petitioner's sentencing claims provide no grounds for federal habeas

relief.  *See e.g., Rodriguez v. Griffin*, No. 9:16-CV-1037 (DNH), 2018 WL 6505808, at *24

(N.D.N.Y. Dec. 11, 2018) ("[Petitioner]'s . . . sentences . . . even if representing the maximum

amount of time permissible ... fall within the limits set by New York law and therefore

petitioner's claim provides no grounds for federal habeas relief.").

      Therefore, Ground 3 is denied and dismissed.

## V.    CONCLUSION

      **WHEREFORE**, it is

      **ORDERED** the Clerk update the Docket Report and caption to reflect the proper

respondent, Miller; and it is further

      **ORDERED** that the Petition, Dkt. No. 1, is **DENIED AND DISMISSED** in its entirety;

and it is further

      **ORDERED** that the Court declines to issue a Certificate of Appealability ("COA").  28

U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of

appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the

district court's resolution of his constitutional claims or that jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further.' ") (quoting *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003)); and it is

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules of Practice.

Dated:  May 5, 2025
           Syracuse, New York

Glenn T. Suddaby
U.S. District Judge